**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CENTENNIAL BANK,<br><br>     Plaintiff,<br><br>vs.<br><br>TERRA PROPERTY TRUST, INC.,<br><br>     Defendant. | Case No.: 1:23-CV-05855-KPF-GWG<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

  Plaintiff Centennial Bank ("Plaintiff" or "Lender"), by and through its undersigned counsel, brings this action against Defendant Terra Property Trust, Inc. ("Guarantor"), and in support thereof, alleges as follows:

<u>**NATURE OF ACTION**</u>

  1. Guarantor is liable for both defrauding Plaintiff to the tune of over $17 million, and for refusing to honor an express contractual commitment to indemnify Plaintiff for the same sum. In brief, both Guarantor and a third party deliberately withheld key information from Plaintiff in contract negotiations, which directly caused a mandatory payment to Plaintiff to be calculated at more than $17 million less than it rightfully should have been—and would have been, had Guarantor and its affiliate honored their duty of disclosure.  Guarantor must make Plaintiff whole for $17,279,166.69 in out-of-pocket damages caused by their deception.

  2. Plaintiff is the lender on a loan worth $45 million (the "Loan") to non-party Terra Ocean Ave, LLC ("Borrower"), an affiliate of Guarantor's.  The Loan is made in respect of real leasehold property leased by Borrower under a 99 year ground lease: land covered by an office building in Santa Monica, California.

3.      The contracts between Plaintiff and Borrower papering the Loan require Borrower to make, at a specified time, a substantial pre-payment on the Loan, the amount of which is to be calculated by Plaintiff based on particular factors (the "Rent Reset Prepayment").  Borrower was also contractually obligated to provide Plaintiff with any "material" correspondence regarding the ground lease of the real property, and regarding the Rent Reset Prepayment in particular.

4.      For its part, Guarantor executed an unconditional guaranty agreement with Plaintiff dated September 27, 2018 (the "Guaranty"), contemporaneous with, and as part of the same transaction as, Borrower's execution of the operative Amended and Restated Credit and Security Agreement with Plaintiff (the "Credit Agreement").

5.      In the summer of 2021, Plaintiff, Borrower, and Guarantor were negotiating an extension of Borrower's deadline to make the Rent Reset Prepayment, through a forbearance agreement.  However, Borrower and Guarantor concealed key facts from Plaintiff in these negotiations that sabotaged the calculation of the Rent Reset Prepayment and tainted the transaction as a whole.

6.      Specifically, Plaintiff was aware that Borrower and its landlord had disputed the proper calculation of annual rent for the years 2020 through 2025 in litigation.  However, Borrower provided Plaintiff with a letter from the landlord's counsel accepting that the ground rent amount would be calculated at $2.079 million per year; and both Borrower and Guarantor expressly certified as much to Plaintiff in the resulting forbearance agreement.

7.      In doing so, Borrower and Guarantor deliberately kept key facts from Plaintiff, costing Plaintiff millions.

8.      Specifically, Borrower and Guarantor did not disclose that, not only was the litigation still pending, they had been served with a new, additional cross-complaint by the landlord

which challenged the mechanism by which rent would be calculated beginning in 2025 and for the following 60 years.  The omission of key facts provided to the Plaintiff and Plaintiff's appraiser produced a misleading and inaccurate appraisal on which the Rent Reset Prepayment was based. Borrower and Guarantor's omissions heavily impacted (and continue to impact) estimation of the leasehold's net operating income over the next 60 years, and therefore the present market value of the property. The inaccurate estimate of value, in turn, greatly impacted the proper calculation of the Rent Reset Prepayment.

9.      Because Plaintiff relied on the incomplete and dishonest picture provided by Borrower and Guarantor, remaining unaware of the key facts, Plaintiff calculated the Rent Reset Prepayment at more than $17 million less than it should have been, suffering direct out-of-pocket losses in that amount.

10.     Guarantor is liable to Plaintiff for two distinct, independently-sufficient reasons. First, Guarantor is directly responsible for fraud, based on its misleading and incomplete disclosures to Plaintiff.  And second, Guarantor had unconditionally guaranteed the repayment of any losses caused by Borrower's or Guarantor's fraud or misrepresentation of material fact, a condition triggered by their deception here.

11.     Based on the foregoing, Plaintiff brings this action to recover all damages attributable to Guarantor's misconduct.

**PARTIES**

12.     Plaintiff Centennial Bank is a state-chartered bank organized under the laws of the State of Arkansas.  Plaintiff's principal place of business is in Arkansas.

13.     Defendant Terra Property Trust, Inc. is a Maryland corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because Guarantor, per the terms of the Guaranty, has agreed and consented to the jurisdiction of the United States District Court for the Southern District for any action relating to the Guaranty, and has waived any objection to the laying of venue in or the jurisdiction of said court.

## FACTUAL BACKGROUND

**I.     Context of the Loan**

**A.  The Credit Documents**

16.     As summarized *supra*, Plaintiff originated the Loan to Borrower—non-party Terra Ocean Ave, LLC—worth $45,000,000, in respect of a leasehold estate in certain parcels of real property located at 1733 Ocean Avenue, Santa Monica, County of Los Angeles, California (the "Property"), and other collateral, in or around March 2016.   The Property includes land, encumbered by a 99-year ground lease, covered by a multi-tenant, 91,979 square foot, four-story Class A office building.

17.     The Loan is secured under a Leasehold Deed of Trust, Security Agreements, Assignment of Leases and Fixture Filing dated July 30, 2018 (the "Deed of Trust"), as amended by an Amendment to Leasehold Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated September 27, 2018 (the "Amendment to Deed of Trust").   True and correct copies of the Deed of Trust and Amendment to Deed of Trust are attached hereto as **Exhibits 1** and **2**, respectively.

18.     Pursuant to the Deed of Trust, Borrower is obligated to perform the obligations under the Deed of Trust; an operative Amended and Restated Facility Note; the September 27, 2018 operative Credit Agreement, as amended from time to time; and certain other instruments and agreements modifying, amending, evidencing, securing, guaranteeing, and/or relating to the Loan (collectively, the "Credit Documents").   A true and correct copy of the Credit Agreement is attached hereto as **Exhibit 3**.

19.     Among other provisions, the Deed of Trust imposes on the Borrower certain duties to keep Plaintiff informed.  Specifically, Section 3.9 of the Deed of Trust provides that "Borrower shall . . . promptly deliver to Lender a copy of all material correspondence received by the Borrower with respect to the Ground Lease . . . ."  *See* Ex. 1 at 10.[1]

20.     The provision of the Credit Agreement most relevant to this lawsuit is Section 4.03, which reads in full as follows.

4.03     Mandatory Partial Prepayment.     Not later than the Ground Lease Rent Reset Date, the Borrower shall be required to prepay the Loan by an amount (the "Rent Reset Prepayment"), such that, following such prepayment, (a) the LTV Ratio shall not exceed sixty-five percent (65%), and (b) the DSCR shall be not less than 1.25:1.0.  The determination by the Lender of the Rent Reset Prepayment shall

---

[1] The Ground Lease is, effectively, the lease governing the Property to which Borrower is a party, as tenant. Specifically, the Deed of Trust defines the Ground Lease as:

[T]hat certain Ground Lease (Flamingo Property) dated as of October 1987, as modified by that certain Memorandum of Ground Lease (Flamingo) dated November 13, 1987, that certain Assignment and Assumption of Lease, made as of August 14, 1990, by and between Maguire/Thomas Partners Development, Ltd., as assignor, and Maguire Thomas Partners - Ocean Avenue, Ltd., that certain Amendment to Lease, effective October 19, 2000, by and among Carolyn Artis, as trustee under that certain Declaration of Trust, dated March 27, 1986, and Florence Gurney, as trustee of the Florence J. Gurney Trust, dated March 9, 1982, as amended, and Maguire Partners Development, Ltd., and Maguire Division Partnership LP, that certain Assignment of Ground Lease, made as of October 20, 2000, by and between Maguire Partners Development, Ltd., as assignor, and Maguire Partners - 1733 Ocean, LLC, as assignee, that certain Construction License Agreement by and between 1733 Ocean Avenue Properties, LLC and 1733 Ocean Avenue Properties II, LLC, 1733 Ocean Avenue Properties IV, LLC, 1733 Properties and 1733 Properties II, Maguire Partners-1733 Ocean, LLC, and Related/Santa Monica Development Co., LLC, dated November 11, 2011, and that certain Letter re Completion of Appraisal and Determination of New Annual Base Rent dated October 19, 2015[.]"

*See* Ex. 1 at 1.

be conclusive and binding for all purposes, absent manifest error. Promptly following receipt thereof, the Borrower shall provide the Lender with any material correspondence received by or sent by the Borrower relating to the rent reset under the Ground Lease.

*See* Ex. 3 at 26. Thus, the Rent Reset Prepayment is to be calculated by Plaintiff, but to be set at an amount that would satisfy both of two conditions, concerning (i) the ratio between the outstanding principal on the Loan and the appraisal value of the Property, and (ii) the ratio between Borrower's net operating income and debt service.

21.     Specifically, the "LTV Ratio" is defined in the Credit Agreement to mean, "as of any date of calculation, the quotient obtained (expressed as a percentage) by dividing (a) the sum of the Principal Amount, by (b) the aggregate 'as-is' market value of the Mortgaged Property determined by an Appraisal acceptable to Lender." *Id.* at 8. The DSCR is defined as "for the period of time for which such calculation is being made, the ratio of (a) the Net Operating Income, to (b) the Debt Service." *Id.* at 4.

22.     The LTV Ratio and the DSCR—the factors governing Plaintiff's calculation of the Rent Reset Prepayment per the Credit Agreement—are heavily dependent on the market value of the Property, and the Property's future income over the remaining 65 years of a 99-year leasehold.

23.     The leasehold estate securing the Loan, as reflected in the Credit Documents, was created pursuant to a certain Ground Lease (Flamingo Property) dated October 16, 1987 ("Ground Lease"), as amended from time-to-time, by and between Borrower (as successor-in-interest to Maguire/Thomas Partners Development, Ltd., a California limited partnership), as tenant, and non-party Ocean Avenue Santa Monica Realty, LLC, a Delaware limited liability company (as successor-in-interest to Carolyn Artis, as trustee under that certain Declaration of Trust dated March 27, 1986, and Florence Gurney, as trustee of the Florence J. Gurney Trust dated March 9, 1982, as amended), as landlord ("Landlord").

### B.  The Guaranty

24.     Contemporaneous with and in furtherance of the execution of the Credit Agreement, Guarantor executed an Amended and Restated Guaranty dated September 27, 2018 in favor of Plaintiff, for the purpose of inducing and in consideration for Plaintiff's extension of the Loan to Borrower.  A true and correct copy of the Guaranty is attached hereto as **Exhibit 4**.

25.     The Guaranty, by its terms, is absolute and unconditional.  Section 2.01 of the Guaranty provides: "Guarantor hereby absolutely and unconditionally guaranties, the prompt satisfaction and discharge of the Guaranteed Obligations (as hereinafter defined), without defense, offset, counterclaim or right of subrogation, subject to Section 3.04 hereof."  Ex. 4 at 2.

26.     Section 2.02(f) of the Guaranty defines the "Guaranteed Obligations" to include several categories of obligation, including "Partial Recourse Liabilities" and "Ground Rent Liabilities."  *Id.* at 4.

27.     In turn, Section 2.02(b)(i) of the Guaranty defines "Partial Recourse Liabilities" to include "any and all actual out-of-pocket monetary losses (including but not limited to loss of principal due under the Loan), costs, damages, expenses, liabilities, claims or other obligations incurred by [Plaintiff] (including reasonable attorneys' fees and costs) arising out of or in connection with . . . any fraud or intentional misrepresentation of a material fact by Borrower or Guarantor or any Person acting on behalf Borrower or Guarantor in connection with any of the Credit Documents or any request for any action or consent by [Plaintiff]. . . ."  *Id.* at 3.

28.     Section 2.02(e) of the Guaranty defines "Ground Rent Liabilities" as "the Rent Reset Prepayment."  *Id.* at 4.

II.     **Borrower and Guarantor Fraudulently Sabotage the Rent Reset Prepayment**

    A.  **Plaintiff Calculates the Rent Reset Prepayment in Reliance on Borrower's and Guarantor's Fraudulent Representations**

29.     Per the Credit Agreement, the Ground Lease Rent Reset Date—i.e., the deadline for Borrower to make the Rent Reset Prepayment to Plaintiff—was originally November 1, 2020. *See* Ex. 3 at 6.

30.     On October 30, 2020, Borrower, Guarantor, and Plaintiff entered into a Forbearance and Amendment Agreement (the "Forbearance Agreement") which, among other things, temporarily extended Borrower's deadline to tender the Rent Reset Prepayment.  A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit 5**.

31.     In connection with the negotiation and execution of the Forbearance Agreement, Borrower disclosed to Plaintiff that Borrower had initiated a legal proceeding against Landlord regarding the recalculation of the annual base rent under the Ground Lease for the Property for the years 2020 through 2025, to become effective November 1, 2020.  The litigation was entitled *Terra Ocean Ave, LLC v. Ocean Avenue Santa Monica Realty, LLC, et al.*, Case No. 20STCV34217, in the Superior Court of California for the County of Los Angeles (the "Landlord Litigation"). Borrower advised Plaintiff that, as a result of the disputes in the Landlord Litigation, the recalculated annual base rent for the Property to become effective under the Ground Lease as of November 1, 2020, had not yet been determined or agreed upon.

32.     Specifically, Michael Muscat ("Muscat"), who held the position of asset manager with Guarantor, informed Michael Walsh ("Walsh"), managing director with Plaintiff, on or about November 2, 2020, that (i) Borrower and Landlord had each hired an appraiser who had prepared an appraisal of the Property to help determine the annual ground rent, given that Landlord and Borrower disputed in rent arbitration proceedings "what it is that their appraisers are supposed to

appraise i.e. how to interpret the ground lease"; (ii) the two sides could not agree on a choice of third-party arbitrator to make a final determination of the land value, so that the annual rent for the years 2020 through 2025 could not yet be calculated, and (iii) that to resolve the deadlock, Borrower had filed the Landlord Litigation to obtain through judicial relief a short list of court-approved third-party arbitrators.  Walsh asked Muscat to provide any and all documentation regarding the Landlord Litigation.

33.     Muscat provided the Borrower's initial complaint and the Landlord's cross complaint but ultimately refused to provide further documents concerning the Landlord Litigation to Plaintiff, despite Walsh's request.  Muscat's basis for withholding further information was the claim that the judge in the Landlord Litigation had issued a "gag order" such that the documents were "unavailable" to Plaintiff.

34.     Aware that Borrower was affirmatively obligated by the Deed of Trust and Credit Agreement to disclose "material correspondence" affecting the Ground Lease and the Rent Reset Prepayment, respectively, and trusting in that express obligation, Plaintiff credited and relied on Borrower's and Guarantor's representations concerning the Landlord Litigation as relayed by Muscat as being complete and final.

35.     Borrower, Guarantor, and Plaintiff executed an amendment to the Forbearance Agreement on March 3, 2021, effective February 28, 2021 (the "First Amendment to Forbearance Agreement").  A true and correct copy of the First Amendment to Forbearance Agreement is attached hereto as **Exhibit 6**.

36.     In May 2021, during the deadlock between Borrower and Landlord in setting the new ground rent for 2020-2025, Plaintiff engaged its legal counsel, Reed Smith LLP, to obtain for Plaintiff an appraisal of the market value of the leasehold interest in the Property.  This appraisal

was ordered on the Plaintiff's belief that a deadlocked dispute between the Landlord and Borrower might not be resolved in a commercially reasonable time frame, and could potentially persist indefinitely, violating Borrower's obligations requiring a timely loan rebalance via the Rent Reset Prepayment.

37.     The Reed Smith appraisal considered the effects on the Property's market value if the prior arbitrated and settled issues were to be broadly re-litigated outside of historical arbitration precedents.  A new, non-arbitration process would likely run for years, be expensive, and introduce a significant encumbrance to the leasehold which would greatly diminish its potential value. Accordingly, such a scenario would greatly depress the Property's market value, as the leasehold Property would be significantly less attractive to any potential buyer if enmeshed in broad, continuing, protracted litigation where prior settled claims could potentially be re-opened.

38.     Plaintiff initially calculated, on the basis of the Reed Smith appraisal, that the Rent Reset Prepayment (loan rebalance payment) should be $28,547,213.12.

39.     In the months following the First Amendment to Forbearance Agreement, Plaintiff, on the one hand, and Borrower and Guarantor, on the other hand, began negotiating a further extension of Borrower's deadline to pay the Rent Reset Prepayment.  Plaintiff, in good faith, agreed to allow Borrower additional time.

40.     In connection with negotiating a further forbearance agreement extending the deadline for the Rent Reset Prepayment, Borrower provided Plaintiff with a copy of a letter from Landlord's counsel, addressed to Borrower, dated June 3, 2021 (the "Landlord Letter").  The Landlord Letter represented that the recalculated annual base rent, effective (retroactively) as of November 1, 2020 through 2025, was calculated at $2,079,000.00 per year.

41.     The Landlord Letter indicated that Borrower's and Landlord's ground rent dispute had been resolved, with a figure for annual 2020-2025 ground rent agreed upon.

42.     Consistent with this interpretation, Muscat affirmatively represented to Plaintiff that Borrower and Landlord were in agreement as to annual ground rent for the years 2020 through 2025.  Neither Borrower nor Guarantor, through Muscat or otherwise, disclosed the existence of any anticipated or new pending litigation beyond Landlord and Borrower's dispute regarding the 2020-2025 annual rent.

43.     Through the information Borrower and Guarantor disclosed to Plaintiff, and that which Borrower and Guarantor withheld, Borrower and Guarantor caused Plaintiff to believe that Landlord and Borrower would likely engage in similar ground rent negotiations in the future, but strictly within the framework of prior land rent arbitration proceedings, as had historically occurred with each prior 5-year land rent reset.  Since the original execution of the ground lease in 1984, prior arbitration outcomes were well documented, and provided a basis of predictability which is required by appraisers and investors when evaluating the potential present value of future cashflows.  Since the tenant does not own the land upon which the improvements are constructed, but leases this element from the landlord, the tenant having a defined and predictable ground lease structure is essential when estimating the Property's value (present value of all future net leasehold cash flows).

44.     In reliance on the information and representations provided by Guarantor and Borrower, Plaintiff commissioned a separate third-party appraisal management company, Summerstreet Advisors ("Summerstreet"), to obtain an appraisal of the market value of the leasehold interest in the Property.  Summerstreet's appraisal, dated July 2, 2021, was based on specific property information provided by the Guarantor, including the new annual rent figure of

$2.079 million covering the years 2020-2025.  Unlike the Reed Smith appraisal, Summerstreet's appraisal did not consider any pending or new litigation or material disputes impacting the Property's actual marketability or market value.

45.     Borrower and Guarantor memorialized their assurances to Plaintiff in the second amendment to the Forbearance Agreement, executed July 29, 2021 but effective May 31, 2021 (the "Second Amendment to Forbearance Agreement").  A true and correct copy of the Second Amendment to Forbearance Agreement is attached hereto as **Exhibit 7**.

46.     Specifically, in the recitals of the Second Amendment to Forbearance Agreement— to which both Borrower and Guarantor are signatories—Borrower and Guarantor certified that "the Recalculated Ground Rent under the Ground Lease (i.e., the annual base rent under the Ground Lease which is effective retroactively as of November 1, 2020) has been determined to be $2,079,000.00." *See* Ex. 7 at 4.

47.     Plaintiff relied upon Borrower's and Guarantor's representations and disclosures as set forth above in calculating the Rent Reset Prepayment under the factors prescribed by the Credit Agreement.  In particular, Plaintiff utilized the Summerstreet appraisal of the Property in doing so, which was based on property information and assumptions derived from Borrower's and Guarantor's representations.

48.     Representatives of the Guarantor were provided with a copy of the Summerstreet appraisal at this time for review.  However, they failed to report to either the appraiser or the Plaintiff that the value in this report was estimated on the basis of incomplete disclosures that omitted key facts concerning the Landlord Litigation and its impact on the leasehold value.  In so doing, the representatives of the Guarantor further misled the appraiser and appraisal process.

49.     As a result of and based upon Borrower's and Guarantor's representations, Plaintiff calculated the Rent Reset Prepayment to be $11,268.046.43.  *See* Ex. 7 at 4-5.  This sum was $17,279,166.69 less than the calculation prescribed by the Reed Smith appraisal.

50.     Borrower's and Guarantor's representations and disclosures to Plaintiff, the basis of the Rent Reset Prepayment, were knowingly false.  Plaintiff was materially misled by Borrower's and Guarantor's incomplete, deceptive, and fraudulent representations.

51.     As a direct result of Borrower's and Guarantor's fraud, when Borrower tendered the Rent Reset Prepayment, it was over $17 million less than the Credit Agreement properly required.

**B.  Consequences of Borrower's and Guarantor's Fraud**

52.     At all times during the negotiation of the Second Amendment to Forbearance Agreement—including after the date of the Landlord Letter—Borrower and Guarantor were both aware that the Landlord Litigation was still pending.  However, neither Borrower nor Guarantor disclosed this fact to Plaintiff until after the Second Amendment to Forbearance Agreement had been executed and the improperly-calculated Rent Reset Prepayment had been tendered.

53.     Further, well before the Second Amendment to Forbearance Agreement was finalized and executed on July 29, 2021, Borrower and Guarantor were aware that the Landlord had filed a Cross-Complaint for Declaratory Relief, dated June 18, 2021 (the "Cross-Complaint"), in the Landlord Litigation.  Both Borrower and Guarantor were further aware of the substance of the Cross-Complaint; in particular, that the Cross-Complaint disputed and called into question the mechanism by which the annual rent on the Property would be calculated for the remaining 60 years of the land lease <u>after</u> 2025.  Again, however, neither Borrower nor Guarantor disclosed the existence and substance of the Cross-Complaint to Plaintiff until after the Second Amendment to

Forbearance Agreement had been executed and the improperly-calculated Rent Reset Prepayment had been paid.

54.     Both the continued pendency of the Landlord Litigation, and the Cross-Complaint's challenge to the calculation of rent after 2025, had immense consequences for any estimate of the present market value of the Property, which is based on future ground rent estimates, and therefore the proper Rent Reset Prepayment.

55.     The market value of the Property was significantly lower given the existence of ongoing litigation, and therefore controversy, over material ground lease terms which define future cash flows of the Property between its tenant and the Landlord, as such litigation would make the Property a far riskier and less attractive investment to potential buyers.  The fact that, per the new and undisclosed Cross-Complaint, this litigation called into significant question what the Property's annual rent would ultimately be for 60 years following 2025 compounded the problem. These factors, in turn, heavily influenced the parameters for the Rent Reset Prepayment set by the Credit Agreement, and thus, the amount of the Rent Reset Prepayment.

56.     For the same reasons, Summerstreet's appraisal of the Property, which Plaintiff used to calculate the Rent Reset Prepayment, massively overstated the Property's true value due to ignorance of the facts withheld by Borrower and Guarantor.  Had Plaintiff been aware of the continued pendency of the Landlord Litigation and the substance of the new Cross-Complaint, Plaintiff would have either insisted on the use of Reed Smith's appraisal, or required Summerstreet to reassess its appraisal, which would have ultimately matched Reed Smith's conclusions.

57.     In sum, if Borrower and Guarantor had disclosed (i) the pendency of the Landlord Litigation, and (ii) the new Cross-Complaint, particularly its challenge to the method for calculating the Property's annual rent for years 2025 through 2086, a period of 60 years, Plaintiff

would have correctly calculated the Rent Reset Prepayment at $28,547,213.12, instead of $11,268,046.43.

58.     Over $17 million in funds that Plaintiff was rightfully entitled to under the parties' agreements was withheld from Plaintiff, for the sole reason that Borrower and Guarantor refused to disclose key facts that would have revealed Plaintiff's entitlement.

59.     Borrower tendered the incorrectly-calculated Rent Reset Prepayment in two installments: $3,230,339.02 paid on March 3, 2021 and $8,037,707.41 on August 2, 2021.

60.     Plaintiff discovered Borrower's and Guarantor's fraudulent concealment in October 2021.

61.     Immediately following the termination of the Second Amendment to Forbearance Agreement on or about August 2, 2021, on behalf of Borrower and Guarantor, Muscat advised Walsh that Borrower and Guarantor intended to move forward with marketing the Property for sale, which would be used to pay off the Loan, and were in discussions with a broker, investors and the Landlord for that specific purpose.  Muscat did not disclose any ongoing disputes with the Landlord.  It temporarily remained Plaintiff's understanding, based on Muscat's representations, that Borrower's and Landlord's dispute had been resolved and that the Landlord and Borrower were in active buy-sell discussions, which Muscat portrayed as productive.

62.     In October 2021, during discussions between Walsh, another of Plaintiff's employees named Tabitha Yewer, and Muscat, Muscat for the first time advised Plaintiff that various ongoing litigation involving the Landlord made the Property "unmarketable," with a market value likely to be less than the Borrower's investment amount.  Because Plaintiff had been unaware of the continued and heightened Landlord Litigation up to that point, Walsh and Yewer

expressed shock at the revelation.  Muscat stated to Walsh and Yewer: "I think I was not supposed to have told you about these litigations."

63.     Immediately following this discussion with Muscat, Plaintiff and its counsel made written demand on Guarantor and Borrower for any and all litigation documents concerning the Landlord Litigation.   Following further review and investigation, Plaintiff confirmed that Borrower and Guarantor had withheld critical information in the negotiation of the Second Amendment to Forbearance Agreement, causing the Rent Reset Prepayment to be calculated and paid at almost one-third the amount it should have been.

64.     Indeed, Borrower's own filings in the Landlord Litigation confirm the drastic impact of its fraud.   In its September 8, 2020 Complaint initiating the Landlord Litigation, Borrower represented to the Superior Court that the ongoing dispute with the Landlord over the Property severely diminishes the Property's value:

> Landlord's ability to re-litigate issues in this manner has caused uncertainty with respect to an interest in real property – *i.e.*, the Lease – and the current and future rent resets.  This has a substantial impact on the value of the Tenant's interest in the Lease.  Specifically, potential buyers of Tenant's leasehold interest have valued said interest at a substantial discount because of the uncertainty of future rent resets and Landlord's ability to relitigate the same issues *ad nauseum*.

65.     Guarantor's representative Don Stern contradicted this position during a further conference call in October 2021, after Plaintiff learned of Guarantor's and Borrower's misrepresentations.  Specifically, in reference to the Borrower's and Guarantor's nondisclosure of the Cross-Complaint, Stern stated to Plaintiff's representatives Walsh, Timothy Zietara, Stuart Miles, and Nicholas Santoro, that "we did not view the litigations as material."

66.     On June 23, 2022, Plaintiff sent Borrower and Guarantor a Reservation of Lender Rights, summarizing their respective obligations to Plaintiff and expressly reserving Plaintiff's rights under the Credit Documents in full.

67.     On July 22, 2022, Plaintiff sent Borrower and Guarantor a Revised Reservation of Lender Rights (the "First Demand Letter").  The First Demand Letter reiterated Plaintiff's prior reservation of rights, and detailed the facts establishing Plaintiff's claims as set forth herein: namely, that Plaintiff had suffered damages of at least $17,279,166.69 as a result of Borrower's and Guarantor's failure to disclose the Cross-Complaint, causing the Rent Reset Prepayment to be miscalculated.

68.     Borrower and Guarantor responded to the First Demand Letter, via a letter dated July 27, 2022.  In sum and substance, Borrower and Guarantor disputed the basis of Plaintiff's claim regarding the Rent Reset Prepayment, and denied any further obligation toward Plaintiff in connection therewith.

69.     On June 13, 2023, Plaintiff sent Guarantor a Demand for Payment Under Amended and Restated Guaranty dated September 27, 2018 (the "Second Demand Letter"), which provided notice of Plaintiff's claim that Borrower's intentional misrepresentations and omissions induced Plaintiff to enter into the Second Amendment to Forbearance Agreement, resulting in direct monetary losses of no less than $17,279,166.69, and demanded payment from Guarantor under Sections 2.02(b)(1) and 2.02(e) of the Guaranty.

70.     On June 14, 2023, Guarantor responded to the Second Demand Letter and informed Plaintiff that it disputed Plaintiff's claim therein on the same grounds provided in response to the Plaintiff's First Demand Letter dated July 22, 2022.

71.     As of the date of this filing, Guarantor has not paid the additional amount owed to Plaintiff under the Guaranty.

## FIRST CAUSE OF ACTION
**(Fraud)**

72.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Amended Complaint as if fully set forth herein.

73.     During the negotiations of the Second Amendment to Forbearance Agreement between Plaintiff, on the one hand, and Borrower and Guarantor, on the other hand, Guarantor was aware that (i) the Landlord Litigation was ongoing and had not been resolved, and (ii) the Landlord had filed the Cross-Complaint challenging the method by which annual rent on the Property would be calculated for ground rent for the 60 years following the period 2020-2025.  Guarantor was also aware that Borrower had not disclosed, and ultimately did not disclose, these facts to Plaintiff.

74.     During the relevant period, Plaintiff was not aware of these facts.

75.     These facts were material to the Second Amendment to Forbearance Agreement, given their substantial impact on the fair market value of the Property, and thus the proper calculation of the Rent Reset Prepayment.

76.     Because of the importance of these facts in calculating the Rent Reset Prepayment, the transaction in question—negotiation and execution of the Second Amendment to Forbearance Agreement, and calculation and payment of the Rent Reset Prepayment—Guarantor's concealment of these facts rendered the transaction inherently unfair, in that it caused Plaintiff to calculate the Rent Reset Prepayment as over $17 million less than it should have rightfully received.

77.     Based on Guarantor's superior knowledge of the context and substance of the Landlord Litigation, particularly given Guarantor's awareness that disclosure would significantly affect the substance of the Second Amendment to Forbearance Agreement concerning the proper

calculation of the Rent Reset Prepayment, Guarantor had an obligation to disclose these facts to Plaintiff.

78.     Nevertheless, Guarantor did not disclose the continued pendency of the Landlord Litigation, or the Cross-Complaint's challenge to the mechanism for rent calculation, to Plaintiff. Indeed, Guarantor deliberately and affirmatively misled Plaintiff to believe that the Landlord Litigation had been resolved, by providing the Landlord Letter, and by representing that the rent dispute underlying the Landlord Litigation had been concluded through agreement on a rent figure of $2,079,000.00 for each year between 2020 and 2025, and that the Borrower and Landlord were in productive buy-sell discussions.

79.     Guarantor acted knowingly and purposefully in concealing the Landlord Litigation's pendency and the substance of the Cross-Complaint, with the intention of inducing Plaintiff to enter the Second Amendment to Forbearance Agreement and causing the Rent Reset Prepayment to be erroneously calculated at a much lower figure than was proper.

80.     As a consequence of Guarantor withholding this information, Plaintiff remained unaware of the Landlord Litigation's continued pendency and the Cross-Complaint's substance until October 2021, well after the Rent Reset Prepayment had been tendered at the improperly-calculated value driven by Guarantor's incomplete, misleading, and deceptive representations.

81.     Plaintiff in fact relied on Guarantor's incomplete, misleading, and deceptive representations—including Guarantor's omissions—in calculating the Rent Reset Prepayment at $11,268,046.43, when it should have been calculated at $28,547,213.12 based on the facts as they actually existed, and would have been calculated at that amount had Guarantor not concealed key facts.

82.     Plaintiff's reliance on Guarantor's representations was reasonable under the circumstances, including based on the parties' bargained-for duties of disclosure and the partial disclosures made by Guarantor.

83.     As a result of Plaintiff's reliance on Guarantor's deception, Plaintiff has suffered losses in an amount to be proven at trial, but no less than $17,279,166.69.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

84.     Plaintiff restates and re-alleges each and every foregoing paragraph of this Amended Complaint as if fully set forth herein.

85.     The Guaranty is fully executed, supported by consideration, and is a valid and enforceable contract in all respects.

86.     Plaintiff performed, or was excused from performing, all of its obligations under the Guaranty.

87.     By its terms, under Section 2.01, the Guaranty is absolute and unconditional.

88.     Under Section 2.02(e) of the Guaranty, Guarantor pledged to indemnify Plaintiff for Borrower's obligation to pay the Rent Reset Prepayment.

89.     Borrower did not satisfy the Rent Reset Prepayment, because—as a direct result of Borrower's and Guarantor's fraud and deception regarding the Landlord Litigation and Cross-Complaint—Borrower paid $11,268,046.43 toward the Rent Reset Prepayment when the true amount of the Rent Reset Prepayment was, and should rightfully have been calculated at, $28,547,213.12.

90.     Per the First Demand Letter and Second Demand Letter, Plaintiff has made demand upon Guarantor to satisfy Borrower's obligation and pay the remaining $17,279,166.69 in

satisfaction of the Rent Reset Prepayment.  However, Guarantor has refused, breaching Section 2.02(e) of the Guaranty.

91.    Additionally, under Sections 2.02(f) and 2.02(b)(1) of the Guaranty, Guarantor pledged to indemnify Plaintiff for losses resulting from fraud, and/or material misrepresentation of fact, in connection with the Credit Documents.

92.    Borrower committed a fraud on Plaintiff in relation to the Credit Documents by deliberately withholding key information concerning the Landlord Litigation for the purpose, and with the effect, of causing the Rent Reset Prepayment to be calculated at substantially less than it rightfully should have been, and would have been if not for Borrower's affirmative misrepresentations and omissions of material fact, as follows:

    a.  During the negotiation of the Second Amendment to Forbearance Agreement, Borrower was aware that (i) the Landlord Litigation was ongoing and had not been resolved, and (ii) the Landlord had filed the Cross-Complaint challenging the method by which annual rent on the Property would be calculated for the 60 years following years after 2025.  Borrower was also aware that Guarantor had not disclosed, and ultimately did not disclose, these facts to Plaintiff.

    b.  During the relevant period, Plaintiff was not aware of these facts.

    c.  These facts were material to the Second Amendment to Forbearance Agreement, given their substantial impact on the fair market value of the Property, and thus the proper calculation of the Rent Reset Prepayment.

    d.  Because of the importance of these facts in calculating the Rent Reset Prepayment, the transaction in question—negotiation and execution of the Second Amendment to Forbearance Agreement, and calculation and payment of the Rent Reset

Prepayment—Borrower's concealment of these facts rendered the transaction inherently unfair, in that it caused Plaintiff to calculate the Rent Reset Prepayment as over $17 million less than it should have rightfully received.

e.  Based on Borrower's superior knowledge of the context and substance of the Landlord Litigation, particular given Borrower's awareness that disclosure would significantly affect the substance of the Second Amendment to Forbearance Agreement concerning the proper calculation of the Rent Reset Prepayment, Borrower had an obligation to disclose these facts to Plaintiff.

f.  Moreover, Borrower was subject to express contractual obligations to disclose to Plaintiff all "material correspondence" relating to the Ground Lease and Rent Reset Prepayment, which required disclosure of the pendency of the Landlord Litigation and the Cross-Complaint.

g.  Despite these duties, Borrower did not disclose the continued pendency of the Landlord Litigation, or the Cross-Complaint's challenge to the mechanism for the Property's rent calculation, to Plaintiff.   Indeed, Borrower deliberately and affirmatively misled Plaintiff to believe that the Landlord Litigation had been resolved, by providing the Landlord Letter and representing that the underlying rent dispute between Borrower and Landlord had been concluded through the parties' agreement that rent for the years 2020 through 2025 would be set at $2,079,000.00 per year.

h.  Borrower acted knowingly and purposefully in concealing the Landlord Litigation's pendency and the substance of the Cross-Complaint from Plaintiff, with the intention of inducing Plaintiff to enter into the Second Amendment to

Forbearance Agreement and causing the Rent Reset Prepayment to be erroneously calculated at a much lower figure than was proper and correct.

i.  As a consequence of Borrower withholding this information from Plaintiff, Plaintiff remained unaware of the Landlord Litigation's continued pendency and the Cross-Complaint's challenge to rent calculation until October 2021.

j.  Plaintiff relied on Borrower's incomplete, misleading, and deceptive representations and omissions in calculating the Rent Reset Prepayment at $11,268,046.43, when it should have been calculated at $28,547,213.12 based on the facts as they actually existed, and would have been calculated at that amount had Borrower not concealed key facts.

k.  Plaintiff's reliance on Borrower's representations was reasonable under the circumstances, including based on the parties' bargained-for duties of disclosure and the partial disclosures that Borrower made.

l.  Plaintiff suffered damages from Borrower's fraud in an amount to be determined at trial, but at least $17,279,166.69.

93.  Borrower's fraud in connection with the Credit Documents triggers Guarantor's obligation to indemnify Plaintiff under Sections 2.02(b)(i) and 2.02(f) of the Guaranty.

94.  Per the First Demand Letter and Second Demand Letter, Plaintiff has made demand upon Guarantor to satisfy Borrower's obligation and pay the remaining $17,279,166.69 in satisfaction of the Rent Reset Prepayment.  However, Guarantor has refused, breaching Sections 2.02(b)(i) and 2.02(f) of the Guaranty.

95.  To date, Guarantor has not paid Plaintiff any amount in satisfaction of the Guaranty.

96.     As a result of Guarantor's breaches of the Guaranty, Plaintiff has been, and continues to be damaged in an amount to be determined at trial, but no less than $17,279,166.69.

97.     In addition, Section 3.03 of the Guaranty requires Guarantor to pay "all reasonable out-of-pocket costs incurred by Lender in collecting any amount payable under this Guaranty or enforcing or protecting its rights under the Guaranty . . . ."  Accordingly, Plaintiff is further entitled to an award of its fees and expenses, including but not limited to those incurred in this litigation, and interest at the contractually-specified Default Rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in its favor and against Guarantor, as follows:

1. For a declaration adjudging Guarantor to have breached the Guaranty by refusing to indemnify Plaintiff for (i) Borrower's fraud in connection with the Credit Documents and (ii) Borrower's failure to satisfy the Rent Reset Prepayment;

2. For compensatory damages in an amount to be determined at trial, but no less than $17,279,166.69;

3. For punitive damages in an amount to be determined at trial, based on Guarantor's fraud;

4. For an award of pre-judgment interest at the statutory rate;

5. For an award of post-judgment interest at the contractually-specified Default Rate, per Section 3.01 of the Guaranty;

6. For an award of Plaintiff's reasonable attorney's fees and costs incurred in this dispute, including but not limited to this litigation, and interest thereon per Section 3.03 of the Guaranty; and

7. For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

Dated:  August 22, 2023             REED SMITH LLP


By: /s/ *Casey D. Laffey*
     Casey D. Laffey
     John P. Kennedy
     599 Lexington Avenue
     New York, NY 10022
     T:  (212) 521-5400
     F:  (212) 521-5450

     *Attorneys for Plaintiff Centennial Bank*

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues properly so tried.


Dated: August 22, 2023                    REED SMITH LLP


By: _/s/ Casey D. Laffey_
    Casey D. Laffey
    John P. Kennedy
    599 Lexington Avenue
    New York, NY 10022
    T:  (212) 521-5400
    F:  (212) 521-5450

    *Attorneys for Plaintiff Centennial Bank*